## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

TYRONE MOULTRIE,

     Petitioner,

v.                            Case No.: 3:17-cv-73-MCR/MJF

FLORIDA DEPARTMENT OF
CORRECTIONS,

     Respondent.

_____/

## REPORT AND RECOMMENDATION

Petitioner Tyrone Moultrie has filed a petition for writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 1). Respondent ("the State") answered, providing relevant portions of the state court record. (Doc. 22). Moultrie replied. (Doc. 30). The undersigned concludes that no evidentiary hearing is required for the disposition of this matter, and that Moultrie is not entitled to habeas relief.[1]

---

[1] This case was referred to the undersigned to address preliminary matters and to make recommendations regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C); Fed. R. Civ. P. 72(b).

I.    **Background and Procedural History**[2]

Jerome Peters, the victim in this case, was a cook at Joe Patti's Deli in Pensacola, Florida. As a side job, Mr. Peters sold clothing and shoes out of his car. Mr. Peters developed his business by word-of-mouth. Prospective customers would call Peters and he would bring his inventory to the customer to peruse. Sales were made on the spot.

In August 2010, Moultrie, his codefendant Omar Hickenbotham, and at least one other co-conspirator who was never identified, decided to rob Mr. Peters. On the evening of August 10, 2010, Moultrie, Hickenbotham and their cohort(s) lured Mr. Peters to an Exxon gas station under the guise of buying clothing from him. They told Mr. Peters that they would be in a white car. Mr. Peters, assisted by his girlfriend Valerie Merritt, loaded bags of clothing and shoes into Peters's car and arrived at the Exxon station around 10:00 p.m. Mr. Peters parked his car, exited, and opened his trunk to reveal his inventory. Ms. Merritt remained in the passenger seat. Merritt saw the white car of the prospective buyer, and noticed there were "at least" two people in it. Moultrie and Hickenbotham exited the white car and walked to the trunk of Mr. Peters's car, where Hickenbotham began looking through Peters's inventory.

---

[2] The facts are drawn from the evidence presented at trial, viewed in the light most favorable to the State. (Doc. 22, Attachs. 2-3, Ex. B (trial transcript)); *see also Jackson v. Virginia*, 443 U.S. 307 (1979).

After approximately five minutes, Ms. Merritt heard a scuffle and saw that Hickenbotham and Moultrie had forced Peters to a dark area near the car wash of the Exxon station. Ms. Merritt got out of the car, approached the area and saw Mr. Peters lying on the ground with Moultrie and Hickenbotham standing over him. Ms. Merritt screamed, "No, no, no, . . . [j]ust take what you want." Mr. Peters sat up and yelled for her to go back to the car and call the police. Ms. Merritt ran back to the car and, just as she grabbed her phone, heard three gunshots. Hickenbotham had fatally shot Mr. Peters through the head. Moultrie, Hickenbotham, and their cohort(s) fled the scene with a gold necklace from Mr. Peters's neck and three-quarters of the inventory from his car.

In Escambia County Circuit Court Case No. 2010-CF-3651, a grand jury indicted Moultrie and Hickenbotham for one count of first-degree felony murder. (Doc. 22, Attach. 1, Ex. A at 1-2).[3] Moultrie was tried with Hickenbotham and found guilty as charged. (Doc. 22, Attachs. 2-3, Ex. B (trial transcript); Attach. 1, Ex. A, at 48 (verdict)). The trial court adjudicated Moultrie guilty and sentenced him to life in prison without the possibility of parole. (Doc. 22, Attach. 1, Ex. A at 50-57). The

---

[3] Citations to the state court record are to the electronically-filed exhibits attached to the State's answer. (Doc. 22). The citation refers to the electronic attachment number followed by the exhibit. If a page of an exhibit bears more than one page number, the court cites the number appearing at the bottom center of the document.

Florida First District Court of Appeal ("First DCA"), affirmed on August 21, 2012, *per curiam* and without written opinion. *Moultrie v. State*, 96 So. 3d 889 (Fla. 1st DCA 2012) (Table) (copy at Doc. 22, Attach. 4, Ex. F).

On July 16, 2013, Moultrie filed a *pro se* motion for postconviction relief under Florida Rule of Criminal Procedure 3.850, which he twice amended. (Doc. 22, Attach. 5, Ex. H at 134-50 (original motion); Ex. H at 154-72 (amended motion); Ex. H at 180-200 (second amended motion)). The state circuit court conducted a limited evidentiary hearing where Moultrie was assisted by counsel. (Doc. 22, Attach. 5, Ex. I at 226-27 (order setting hearing); Ex. I at 228-65 (evidentiary hearing transcript)). On July 22, 2015, the circuit court entered a written order denying relief on all claims. (Doc. 22, Attach. 5, Ex. I at 304-14). Moultrie appealed, represented by new counsel. (Doc. 22, Attach. 5, Ex. J). The First DCA affirmed *per curiam* without written opinion. *Moultrie v. State*, 222 So. 3d 1209 (Fla. 1st DCA 2017) (Table) (copy at Doc. 22, Attach. 6, Ex. M). The mandate issued January 23, 2017. (Doc. 22, Attach. 6, Ex. N).

Moultrie filed his *pro se* federal habeas petition on January 24, 2017, raising nine claims. (Doc. 1). The State asserts that Moultrie is not entitled to habeas relief because his claims are either procedurally defaulted, devoid of merit, or both. (Doc. 22). Moultrie's reply withdraws one claim (Ground Eight). (Doc. 30).

## II.    Governing Legal Principles

### A.    Exhaustion and Procedural Default

Before seeking federal habeas relief under § 2254, the petitioner must exhaust all available state court remedies for challenging his conviction, 28 U.S.C. § 2254(b)(1), thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971) (citation omitted)). To satisfy the exhaustion requirement, the petitioner must "fairly present" his claims to the state court, *Picard*, 404 U.S. at 275, "such that a reasonable reader would understand each claim's particular legal basis and specific factual foundation." *French v. Warden, Wilcox State Prison*, 790 F.3d 1259, 1270 (11th Cir. 2015) (quoting *Kelley v. Sec'y Dep't of Corr.*, 377 F.3d 1317, 1344-45 (11th Cir. 2004)). "A party does not fairly present a claim if he presents the claim in state court for the first time in a procedural context in which the merits will not ordinarily be considered." *Harris v. Sec'y, Fla. Dep't of Corr.*, 709 F. App'x 667, 668 (11th Cir. 2018) (citing *Castille v. Peoples*, 489 U.S. 346, 351 (1989)).

A claim that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, *i.e.,* procedurally barred from federal review. *O'Sullivan v. Boerckel*, 526 U.S. 838, 839-40, 848 (1999); *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991) ("[I]f the

petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred . . . there is a procedural default for purposes of federal habeas . . . ." (citations omitted)). A petitioner seeking to overcome a procedural default must "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.

### B.    Section 2254 Standard of Review

A federal court "shall not" grant habeas relief to a state prisoner on any claim that was adjudicated on the merits in state court unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). The United States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362 (2000).[4] In *Williams*, Justice O'Connor described the appropriate test:

---

[4] Unless otherwise noted, references to *Williams* are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367-75, 390-99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403-13).

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412-13 (O'Connor, J., concurring).

Under the *Williams* framework, the federal court must first determine the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). After identifying the governing legal principle, the federal court determines whether the state court's adjudication of the federal claim is contrary to the clearly established Supreme Court case law. The adjudication is "contrary to" federal law only if either the reasoning or the result contradicts the relevant Supreme Court cases. *See Early v. Packer*, 537 U.S. 3, 8 (2002) ("Avoiding th[e] pitfalls [of § 2254(d)(1)] does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.").

---

The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

If the "contrary to" clause is not satisfied, the federal court determines whether the state court "unreasonably applied" the governing legal principle set forth in the Supreme Court's cases. The federal court defers to the state court's reasoning unless the state court's application of the legal principle was "objectively unreasonable" in light of the record before the state court. *See Williams*, 529 U.S. at 409; *Holland v. Jackson*, 542 U.S. 649, 652 (2004). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

Section 2254(d) also allows habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See Gill v. Mecusker*, 633 F.3d 1272, 1292 (11th Cir. 2011). As with the "unreasonable application" clause, the federal court applies an objective test. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding."). Federal courts "may not characterize . . . state-court factual determinations as unreasonable merely because

Page 8 of 69

we would have reached a different conclusion in the first instance." *Brumfield v.*

*Cain*, 576 U.S. —, —, 135 S. Ct. 2269, 2277 (2015) (quotation marks omitted).

The Supreme Court has often emphasized that a state prisoner's burden under

§ 2254(d) is "difficult to meet, . . . because it was meant to be." *Richter*, 562 U.S.

at 102. The Court elaborated:

> As amended by AEDPA, § 2254(d) stops short of imposing a complete
> bar on federal-court relitigation of claims already rejected in state
> proceedings. *Cf. Felker v. Turpin*, 518 U.S. 651, 664, 116 S. Ct. 2333,
> 135 L.Ed.2d 827 (1996) (discussing AEDPA's "modified res judicata
> rule" under § 2244). It preserves authority to issue the writ in cases
> where there is no possibility fairminded jurists could disagree that the
> state court's decision conflicts with this Court's precedents. It goes no
> further. Section 2254(d) reflects the view that habeas corpus is a "guard
> against extreme malfunctions in the state criminal justice systems," not
> a substitute for ordinary error correction through appeal. *Jackson v.*
> *Virginia*, 443 U.S. 307, 332, n. 5, 99 S. Ct. 2781, 61 L. Ed. 2d 560
> (1979) (Stevens, J., concurring in judgment). As a condition for
> obtaining habeas corpus from a federal court, <u>a state prisoner must</u>
> <u>show that the state court's ruling on the claim being presented in federal</u>
> <u>court was so lacking in justification that there was an error well</u>
> <u>understood and comprehended in existing law beyond any possibility</u>
> <u>for fairminded disagreement.</u>

*Richter*, 562 U.S. at 102-03 (emphasis added).

A federal court may conduct an independent review of the merits of the

petitioner's claim only if it first finds that the petitioner satisfied § 2254(d). *See*

*Panetti v. Quarterman*, 551 U.S. 930, 954 (2007). Even then, the writ will not issue

unless the petitioner shows that he is in custody "in violation of the Constitution or

laws and treaties of the United States." 28 U.S.C. § 2254(a).

**C.     Clearly Established Federal Law Governing Claims of Ineffective Assistance of Counsel**

The Supreme Court follows a two-pronged test for evaluating claims of ineffective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668 (1984). The petitioner must show (1) his counsel's performance was constitutionally deficient, and (2) the deficient performance prejudiced him. *See id.* at 687. "First, petitioner must show that 'counsel's representation fell below an objective standard of reasonableness.' Second, petitioner must show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Darden v. Wainwright*, 477 U.S. 168, 184 (1986) (quoting *Strickland*, 466 U.S. at 694).

"Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Trial counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. The burden to overcome that presumption and show that counsel's performance was deficient "rests squarely on the defendant." *Burt v. Titlow*, 571 U.S. 12, 22-23 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) ("To overcome that

presumption, a defendant must show that counsel failed to act reasonably considering all the circumstances.") (quotation marks and alterations omitted).

*Strickland*'s prejudice prong requires a defendant to establish a "reasonable probability" of a different result. *See Strickland*, 466 U.S. at 694. A reasonable probability is one that sufficiently undermines confidence in the outcome. *Id.* "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

When a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. *See Strickland*, 466 U.S. at 698. "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 562 U.S. at 105 (citations omitted). The Supreme Court explained:

> The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Id.* (citations omitted).

## III.   Discussion

**Ground One**     **"Petitioner was denied his right to effective assistance of counsel as guaranteed under the 6th and 14th Amendments to the U.S. Constitution when counsel failed to move to sever Petitioner's trial from that of his co-defendant." (Doc. 1 at 4 in ECF)**

Moultrie claims that his trial counsel, Attorney Kelly Richards, was ineffective when she failed to move to sever his trial under Rule 3.152(b) of the Florida Rules of Criminal Procedure. (Doc. 1 at 4-5 in ECF). Rule 3.152(b) provides:

**(b) Severance of Defendants.**

(1) On motion of the state or a defendant, the court shall order a severance of defendants and separate trials:

(A) before trial, on a showing that the order is necessary to protect a defendant's right to a speedy trial, or is appropriate to promote a fair determination of the guilt or innocence of 1 or more defendants; or

(B) during trial, only with defendant's consent and on a showing that the order is necessary to achieve a fair determination of the guilt or innocence of 1 or more defendants.

(2) If a defendant moves for a severance of defendants on the ground that an oral or written statement of a codefendant makes reference to him or her but is not admissible against him or her, the court shall determine whether the state will offer evidence of the statement at the trial. If the state intends to offer the statement in evidence, the court shall order the state to submit its evidence of the statement for consideration by the court and counsel for defendants and if the court determines that the statement is not admissible against the moving defendant, it shall require the state to elect 1 of the following courses:

(A) a joint trial at which evidence of the statement will not be admitted;

(B) a joint trial at which evidence of the statement will be admitted after all references to the moving defendant have been deleted, provided the court determines that admission of the evidence with deletions will not prejudice the moving defendant; or

(C) severance of the moving defendant.

Fla. R. Crim. P. 3.152(b).

Moultrie contends that counsel knew there was little direct evidence tying him to the crime and that the vast majority of evidence pointed solely to Hickenbotham (for example, Hickenbotham's DNA under Mr. Peters's fingernails, Hickenbotham's fingerprints, and Hickenbotham's incriminating statements to others on the evening of the murder: that he "just shot somebody," he "messed up his life," he "hurt somebody," and "We just hit a nigger."). (Doc. 1 at 4 in ECF). Moultrie argues that his case satisfied Rule 3.152(b)'s standard, because severance was necessary to prevent him from being denied his right of confrontation (due to admission of Hickenbotham's statements) and to ensure a fair determination of his guilt or innocence of the crime (as opposed to guilt by association).

Moultrie asserts that he was prejudiced by counsel's failure to move for severance because "[h]ad it not been for counsel's deficient performance, there exists a reasonable probability the outcome of the proceedings would have been

different by the trials being severed, preventing a *Bruton* violation, ensuing in Petitioner being provided his rights to due process and a fair trial, resulting in reasonable doubt being formed and an acquittal." (Doc. 1 at 5 in ECF); *see Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620 (1968) (holding that a criminal defendant is deprived of his right of confrontation when a nontestifying codefendant's facially incriminating confession, naming the defendant as a participant, is introduced at their joint trial).

The State asserts that to the extent Moultrie claims his trial counsel was ineffective for failing to move for severance under Rule 3.152(b), his claim is exhausted; however, to the extent Moultrie argues his counsel was ineffective for failing to make a *Bruton*-based objection to the introduction of Hickenbotham's statements, that aspect of his claim is procedurally defaulted because Moultrie did not raise it in his state postconviction proceeding. (Doc. 22 at 14, 25).

Moultrie replies that the manner through which he presented his severance claim in the state postconviction proceeding "indicated in an understandable and specific format of [sic] the violations under *Bruton*, which thereby provided the Court with a meaningful opportunity to address it." (Doc. 30 at 4).

### A.    Moultrie Properly Exhausted His Claim that His Counsel Was Ineffective for Failing to Move for a Severance

Moultrie's habeas petition raises a single deficiency in Ground One—Attorney Richards's failure to move for severance under Florida Rule 3.152(b). Neither the labeling of Moultrie's claim, nor the body of his argument, faults counsel for failing to make a *Bruton*-based objection to the admission of Hickenbotham's statements. Moultrie's reference to *Bruton* is in the context of <u>arguing why counsel's failure to move for severance prejudiced him</u>. Because this claim is confined to counsel's failure to move for severance under Florida Rule 3.152(b), which is the same claim he raised in state court, Moultrie properly has exhausted his state court remedies regarding this claim.

### B.    If Moultrie Were to Seek Federal Habeas Relief on a Claim that Counsel Was Ineffective for Failing to Object to Admission of Hickenbotham's Statements on *Bruton* or Confrontation Clause Grounds, the Claim Would be Procedurally Defaulted

If Moultrie attempted to expand his federal habeas claim to raise an additional instance of ineffective assistance based on counsel's failure to object to admission of Hickenbotham's statements on *Bruton* grounds, that claim would be procedurally defaulted because Moultrie did not fairly present it to the state courts. The record establishes that Moultrie's second amended Rule 3.850 motion did not present the postconviction trial court with a claim that counsel was ineffective for failing to

object to admission of Hickenbotham's statements under *Bruton* or the Confrontation Clause. (Ex. H at 180-200). Similarly, Moultrie's counseled initial brief in his postconviction appeal did not present the First DCA with an ineffective assistance claim based on counsel's failure to object. (Ex. J). Moultrie's single reference to *Bruton* in his initial appellate brief was in the context of arguing the prejudicial effect of counsel's failure to move for severance. (Ex. J at 22).

As Moultrie did not exhaust a claim that counsel was ineffective for failing to object to Hickenbotham's statements, that claim is procedurally defaulted.[5] Moultrie makes none of the requisite showings to excuse his procedural default. Moultrie's procedural default would bar this court from reviewing any claim that counsel was ineffective for failing to object to Hickenbotham's statements when offered.

### C. Section 2254 Review of State Court's Decision Regarding Counsel's Failure to Move for Severance

The parties agree that Moultrie presented his severance-based ineffective assistance claim to the state courts as Ground Four of his second amended Rule 3.850 motion; that the state circuit court denied the claim on the merits in a reasoned order; and that the First DCA summarily affirmed without explanation. (Doc. 1 at 5-6 in

---

[5] Any attempt by Moultrie to return to state court to present that ineffective assistance claim would be futile under Florida's procedural rule barring second or successive Rule 3.850 motions, *see* Fla. R. Crim. P. 3.850(h)(2), and Florida's two-year limitations period on Rule 3.850 motions, *see* Fla. R. Crim. P. 3.850(b).

ECF; Doc. 22 at 26-27). The State asserts that Moultrie is not entitled to habeas relief because he fails to meet § 2254(d)'s demanding standard. (Doc. 22 at 27-31).

The First DCA's summary affirmance is an "adjudication on the merits" of Moultrie's claim and is entitled to deference under 28 U.S.C. § 2254(d). *See Richter*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."); *id*. at 100 ("This Court now holds and reconfirms that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'").

Where, as here, there has been one reasoned state judgment rejecting a federal claim followed by a later unexplained order upholding that judgment, federal courts "'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale, [and] then presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 584 U.S. —, 138 S. Ct. 1188, 1192 (2018). This court, therefore, presumes that the First DCA rejected Moultrie's claim for the same reasons as the state circuit court.

The state circuit court denied relief by written order. (Ex. I at 304-14). The order correctly identified *Strickland* as the controlling legal standard (*id*. at 305), and rejected Ground Four for these reasons:

Defendant claims that counsel should have made a motion to sever the trial from his co-defendant because the evidence against his co-defendant was much stronger.

As a practical matter, if the two defendants had separate trials, the same evidence would have been presented at both trials. Additionally, although Defendant contends that he was clearly not the "triggerman," he was indicted as a principal to murder. Furthermore, the jury was instructed that the co-defendants could be found guilty as principals to each other's actions. Without alleging some specific piece of evidence that would not have been admissible at his own trial, if the cases had been severed, Defendant cannot prove that he was prejudiced by being tried together with his co-defendant. Defendant is not entitled to relief on this claim.

(Ex. I at 308-09).

Fairminded jurists can concur in the state court's conclusion that Moultrie failed to establish prejudice under *Strickland*. The record confirms that Moultrie was charged as a principal to felony murder, with the predicate felony being robbery or attempted robbery. (Ex. A at 1-2). "In Florida, the felony murder rule and the law of principals 'combine to make a felon liable for the acts of his co-felons.'" *Brinson v. State*, 18 So. 3d 1075, 1077 (Fla. 2d DCA 2009) (quoting *Bryant v. State*, 412 So. 2d 347, 350 (Fla. 1982)); *see also* Fla. Stat. §§ 777.011, 782.04.

The Florida Supreme Court has elaborated:

As perpetrators of an underlying felony, co-felons are principals in any homicide committed to further or prosecute the initial common criminal design. One who participates with another in a common criminal scheme is guilty of all crimes committed in furtherance of that scheme regardless of whether he or she physically participates in that crime.

*Lovette v. State*, 636 So. 2d 1304, 1306 (Fla. 1994) (internal quotations marks and citation omitted). Thus, if the defendant is a principal in a criminal enterprise, then he is responsible for a homicide committed in the course of that criminal enterprise even if he had no intent to kill the victim and did not fire the fatal shot. *Id.* at 1307 (holding that the defendant who did not shoot the victim was guilty of felony murder because he was a "willing participants in the armed robbery" and there was a causal connection between the murder and the armed robbery); *see also Williams v. State*, 261 So. 2d 855, 856 (Fla. 3d DCA 1972) (affirming defendant's conviction for second-degree murder where the co-perpetrator shot and killed the victim during the commission of a robbery that both the defendant and the co-perpetrator planned to commit); *Diaz v. State*, 600 So. 2d 529, 530 (Fla. 3d DCA 1992) ("Diaz was [ ] clearly liable for any acts, whether he knew of them ahead of time or not, committed by an accomplice in the furtherance of that offense. . . .").

As applied to Moultrie, if Moultrie participated with Hickenbotham in a common scheme to rob/attempt to rob Mr. Peters, and Hickenbotham killed Mr. Peters in furtherance of that scheme, Moultrie was liable for the robbery/attempted robbery and the murder. To prove Moultrie's liability, the State introduced evidence that codefendant Hickenbotham's fingerprints were on items at the scene of the shooting (plastic bags of clothing inside the trunk of Mr. Peter's car, a shoe box inside the trunk, and a bag of clothing on the ground outside the trunk);

Hickenbotham was seen holding a gun shortly after the shooting; and Hickenbotham's DNA was found under Mr. Peters's fingernails. (Ex. B at 169-70, 224, 232, 327-28). The State also introduced statements Hickenbotham made to others, including a recorded statement to Escambia County Sheriff's Office Investigator Chris Baggett, a statement to Felicia Thomas, two statements to Dashia Laster, and a statement overheard by Markellia Simpkins.

Investigator Chris Baggett testified that Hickenbotham voluntarily appeared at the sheriff's office to be interviewed by investigators. (Ex. B at 250). The audio-recording of the interview on August 12, 2010 (two days after the murder), was published to the jury. (*Id.* at 252-61). During the interview, Hickenbotham denied any involvement in the murder. (*Id.*). Baggett showed Hickenbotham a photograph of Mr. Peters, and Hickenbotham denied knowing him. (*Id.* at 255). Baggett also showed Hickenbotham a photograph of Moultrie, and Hickenbotham acknowledged that he knew Moultrie. (*Id.* at 255-56). Hickenbotham stated that he saw Moultrie at Truman Arms (an apartment complex) on the morning of the murder, but denied seeing him that evening. (*Id.* at 256).

Felicia Thomas testified that she knew Hickenbotham and Moultrie, and that the two men were friends. (Ex. B at 181-82). Hickenbotham and Moultrie came to Ms. Thomas's apartment the night of the shooting. (*Id.* at 182-83). Both Hickenbotham and Moultrie were wearing all black. (*Id.* at 183). Moultrie stood "in

the middle of the door in the back door" of Ms. Thomas's apartment, and Hickenbotham ran into her apartment "sweating real bad." (*Id.*). When Ms. Thomas asked Hickenbotham what was wrong, Hickenbotham responded that he "just shot somebody" and to "watch the news." (*Id.*).

Dashia Laster testified that Hickenbotham telephoned her around 10:00 p.m. on the night of the murder. (Ex. B at 206-07). Hickenbotham told Ms. Laster he needed a favor, and asked her to rent a hotel room for him. (*Id.*). Hickenbotham explained that he wanted to get away from Truman Arms. (*Id.*). Hickenbotham told Ms. Laster that he would call her back, which he did later that evening. (*Id.* at 207-08). During the latter call, Hickenbotham told Ms. Laster that he "F'd up his life." (*Id.* at 208). Laster explained:

> I asked him [Hickenbotham] how and he said he got into a fight with someone and so I asked him was he okay and he said yes. Was the person okay and he said he didn't know. So I asked him what did he mean he didn't know. He said, I don't know. It was either going to be me or him and then he said he would need an alibi of where he had been and would I do it for him and I said no. And he said, Okay, I guess I'll turn myself in.

(Ex. B at 208).

Markellia Simpkins testified that on the night of the murder, she saw a group of approximately six men running along a brick wall at Truman Arms, the apartment complex where she lived. Simpkins then saw the group sitting on the steps outside "Cello's" apartment. (Ex. B at 211-12, 214, 223-26, 230, 241-43). Simpkins

recognized one of the men on the steps as "Omar," another as Michael Grice, another as "Marcus," and another as Moultrie (Simpkins did not know Moultrie by name but recognized his face). (*Id.* at 213, 223-24, 232-33, 243-45). Simpkins observed Hickenbotham holding what appeared to be a gun wrapped in a black shirt or bandanna. (*Id.* at 224). While the group of men sat on the steps, Simpkins heard Hickenbotham say, "We just hit a nigger." (Ex. B at 214-15). The term "hit" was slang for robbing someone. (*Id.* at 215). Simpkins called 911, and the recording of the 911 call was published to the jury. (*Id.* at 216-22). Ms. Simpkins's 911 call reported that there were several black males outside her apartment discussing a robbery and shooting. (*Id.* at 221-22). Simpkins told the 911 operator, "It was Omar that was involved in it. They say he the one that shot them [sic]." (*Id.* at 222).

The State also introduced compelling evidence against Moultrie <u>independent of the evidence against Hickenbotham</u>. Moultrie's finger and palm prints were recovered from the rear passenger side quarter panel of Mr. Peters's car (a white Kia), which contradicted Moultrie's statement to police that they would not find his fingerprints on Mr. Peters's car because he was not at the Exxon station that evening and had never seen Mr. Peters. (Ex. B at 170-71, 268-72).

Felicia Thomas testified that the morning after Mr. Peters's murder, she listened to a cell phone call between Moultrie and Christopher Glover. Glover was in Thomas's apartment when he received the call from Moultrie, and Glover put the

call on speakerphone so Ms. Thomas could hear. During the call, Moultrie, who was with Hickenbotham, admitted that he was at the Exxon station the night before, and that he and Hickenbotham "was supposed to rob this guy and things went bad and he ended up getting shot." (*Id.* at 184-85, 197-98, 204).

Lieutenant Blake with the Escambia County Sheriff's Office testified that he was in charge of serving an arrest warrant on Moultrie, but before he could serve the warrant Moultrie turned himself in. (*Id.* at 376-77). Blake commented to Moultrie, "it's a good thing you turned yourself in. That way we're not bothering your family." (*Id.* at 377). Moultrie "got emotional. His hands were behind his back handcuffed, and he learned [sic] over trying to wipe a tear off on his shoulder" and said "I didn't mean to do it." (*Id.* at 377).

The State also introduced Moultrie's recorded phone calls from the jail wherein he asked various individuals to try to prevent or discourage Felicia Thomas from testifying, and discussed how to discredit Thomas. (*Id.* at 283-310, 353).

The trial court's instructions to the jury, which accurately reflect Florida law, provided in relevant part:

### FELONY MURDER—FIRST DEGREE

To prove the crime of First Degree Felony Murder, the State must prove the following three elements beyond a reasonable doubt:

1. Jerome Peters is dead.

2.    a.    The death occurred as a consequence of and while Tyrone Vincent Moultrie was engaged in the commission of Robbery, or

b.    The death occurred as a consequence of and while Tyrone Vincent Moultrie was attempting to commit Robbery.

3.    a.    Tyrone Vincent Moultrie was the person who actually killed Jerome Peters, or

b.    Jerome Peters was killed by a person other than Tyrone Vincent Moultrie; but both Tyrone Vincent Moultrie and the person who killed Jerome Peters were principals in the commission of Robbery or Attempted Robbery.

In order to convict of First Degree Felony Murder, it is not necessary for the State to prove that the defendant had a premeditated design or intent to kill.

. . . .

## PRINCIPALS

If the defendant helped another person or persons commit or attempt to commit a crime, the defendant is a principal and must be treated as if he had done all the things the other person or persons did if:

1.    the defendant had a conscious intent that the criminal act be done and

2.    the defendant did some act or said some word which was intended to and which did incite, cause, encourage, assist, or advise the other person or persons to actually commit or attempt to commit the crime.

To be a principal, the defendant does not have to be present when the crime is committed or attempted.

SINGLE COUNT, MULTIPLE DEFENDANTS

>The defendants have been tried together; however, you must consider each defendant and the evidence applicable to him separately. You may find one or both guilty or not guilty. However, your verdict as to one defendant must not affect your verdict as to the other.

(Ex. A at 36-37, 39-40, 43).

Given Moultrie's charge and the evidence relevant to that charge, the Florida postconviction court reasonably concluded that Moultrie failed to establish that it was reasonably probable the result of a severed trial would have been different. The jury still would have heard not only the independent evidence of Moultrie's involvement with Hickenbotham in the robbery/attempted robbery, but also the evidence that Hickenbotham killed Mr. Peters in furtherance of his and Moultrie's joint robbery/attempted robbery. Such evidence was relevant to Moultrie's liability for Mr. Peters's death under Florida's felony murder rule and the law of principals.

With respect to admissibility of Hickenbotham's various statements at a severed trial, Moultrie offers only speculation about whether Hickenbotham would have testified and under what circumstances his statements would have been admissible. Moultrie proffers: "Omar's statements would have been excludable if offered against Petitioner in a severed trial, unless Omar, for some reason, chose to testify for the State at Petitioner's trial and was subject to cross-examination." (Doc.

1 at 5 in ECF). Moultrie's speculation does not overcome the demanding standards of *Strickland* and § 2254(d) review.[6] *See Richter*, 562 U.S. at 105.

The state court's rejection of Moultrie's claim was not contrary to and did not involve an unreasonable application of the *Strickland* standard. Moultrie is not entitled to habeas relief on Ground One.

| | |
|---|---|
| **<u>Ground Two</u>** | **<u>"Petitioner was denied his right to effective assistance of counsel as guaranteed under the 6th and 14th Amendments to the U.S. Constitution when counsel failed to object to the introduction of jail phone recordings." (Doc. 1 at 6 in ECF)</u>** |

Moultrie faults Attorney Richards for failing to object to admission of two audio recordings of telephone calls he made from jail. The first recording was a call Moultrie made to his girlfriend, Janay Broughton, the day before trial. During the call, Moultrie expressed concern to Broughton (and others she conferenced into the call) about Felicia Thomas's expected trial testimony and asked what efforts they were making to discourage or prevent her from testifying. In the second call,

---

[6] Assuming that Hickenbotham would not have testified at a severed trial, admission of Hickenbotham's most damning statements—that he "hit" and "just shot" someone—would have been admissible insofar as they were as relevant to Moultrie's liability for felony murder as a principal to the underlying robbery/attempted robbery. Admission of Hickenbotham's statements would not violate *Bruton* or the Confrontation Clause, because they did not facially implicate Moultrie or even reference him. *See Richardson v. Marsh*, 481 U.S. 200, 208 (1987) (holding that neither the *Bruton* rule nor the Confrontation Clause was violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction, because the confession was not incriminating on its face).

Moultrie and Broughton discussed how to discredit Ms. Thomas. (Doc. 1 at 6-7 in ECF); (Doc. 22, Ex. B at 284-94, 296-99) (playing of the recordings during the State's proffer); (Doc. 22, Ex. B at 346-47, 352) (admission and publishing of the recordings).

Moultrie claims that the recordings were "highly prejudicial as it inferred witness tampering and permitted the State to suggest Petitioner had went through all of his efforts to prevent [Ms. Thomas's testimony] from coming into trial." (Doc. 1 at 7 in ECF.). Moultrie alleges that Attorney Richards "did nothing" to exclude the recordings, and that had she argued "the statutory basis preventing introduction" as well as lack of authentication by a jail phone records custodian, there is a reasonable probability that the trial judge would not have admitted the recordings and the jury would have acquitted him. (Doc. 1 at 6-7 in ECF).

The parties agree that Moultrie presented this claim to the state courts as Ground Five of his second amended Rule 3.850 motion; that the state circuit court denied relief on the merits in a reasoned order; and that the First DCA summarily affirmed without explanation. (Doc. 1 at 7 in ECF; Doc. 22 at 32). The State asserts that Moultrie is not entitled to habeas relief because he fails to meet § 2254(d)'s demanding standard. (Doc. 22 at 33-35).

The First DCA's summary affirmance is an "adjudication on the merits" entitled to deference under 28 U.S.C. § 2254(d). *See Richter*, 562 U.S. at 99, 100.

Consistent with *Wilson*, this court "look[s] through" the First DCA's unexplained decision to the circuit court's reasoned order, and presumes the First DCA adopted the same reasoning. *Wilson*, 138 S. Ct. at 1192.

Ground Five of Moultrie's second amended Rule 3.850 motion claimed that counsel should have moved to suppress the recordings as a violation of Sections 934.03 – 934.09, Florida Statutes, because he did not consent to his calls being recorded. (Ex. H at 187). The state circuit court's order correctly identified *Strickland* as the controlling legal standard (Ex. I at 305), and denied relief for these reasons:

> In this ground for relief, Defendant claims that counsel should have made a motion to suppress the recordings of phone calls Defendant had made from jail. Defendant contends that because he did not consent to the recording of the phone calls, they were illegally recorded.
>
> The recording of phone calls made from the jail is a routine practice. It is well-settled that it is permissible to record phone calls made by inmates. Because a motion to suppress was not warranted, counsel was not deficient for failing to file such a motion and Defendant is not entitled to relief.

(Ex. I at 309).

The state court already has answered the question of how an objection under "the statutory basis preventing introduction," *i.e.*, Fla. Stat. §§ 934.03 - 934.09, would have been resolved under state law had counsel made it—the objection would have been overruled. This court must abide by the state court's interpretation of state

law. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus." (citations omitted)); *Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1354-55 (11th Cir. 2005) ("It is a 'fundamental principle that state courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters.'") (quoting *Agan v. Vaughn*, 119 F.3d 1538, 1549 (11th Cir. 1997)). Because counsel had no basis to object under §§ 934.03 - 943.09, the state court's adjudication of this aspect of Moultrie's claim is a reasonable application of the *Strickland* standard.[7] *Meders v. Warden, Ga. Diagnostic Prison*, 911 F.3d 1335, 1354 (11th Cir. 2019) ("It is not ineffective assistance of counsel to fail to make an objection that is not due to be sustained."); *Green v. Georgia*, 882 F.3d 978, 987 (11th Cir. 2018) (holding that habeas petitioner could not possibly have suffered *Strickland* prejudice where the objection that was not made would have been futile); *Pinkney v. Sec'y, DOC*, 876 F.3d 1290, 1297 (11th Cir. 2017) ("[A]n attorney will not be held to have performed deficiently for failing to perform a futile act, one that would not have gotten his client any relief.").

---

[7]As the State points out, this aspect of Moultrie's claim is meritless for the additional, independent reason that the transcripts of Moultrie's phone calls establish that he was warned at the outset of each call: "This call will be recorded and subject to monitoring at any time." (Ex. B, pp. 284, 297).

Moultrie argues in his reply brief that the state court failed to address the "crux" of his claim—that counsel failed to object on grounds of insufficient authentication. (Doc. 30 at 6). The State's answer does not address that aspect of Moultrie's claim (or his exhaustion of it). (Doc. 22 at 33-35). It does not appear Moultrie presented his authentication-based argument to the state courts, but instead argued exclusively that the calls were recorded without his consent in violation of state law. (Ex. H at 188 (second amended Rule 3.850 motion)); (Ex. J at 24) (postconviction appellate brief)). Notwithstanding this procedural posture, Moultrie's claim fails on the merits because it is frivolous. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

Florida's statute governing authentication provides: "Authentication or identification of evidence is required as a condition precedent to its admissibility. The requirements of this section are satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fla. Stat. § 90.901. "[T]here is no specific list of requirements for authentication, and each case must be determined on its own merits." *Vilsaint v. State*, 127 So. 3d 647, 650 (Fla. 4th DCA 2013). "An audio recording may be authenticated by a witness who has some 'prior special familiarity' with the defendant's voice . . . ." *Asencio v. State*, 244 So. 3d

294, 297 (Fla. 4th DCA 2018) (quoting *Evans v. State*, 177 So. 3d 1219, 1230 (Fla. 2015)). "Alternatively, an audio recording may be authenticated by a records custodian of the jail calls . . . ." *Asencio*, 244 So. 3d at 297 (discussing *United States v. Harris*, 338 F. App'x 892, 894 (11th Cir. 2009)).

Contrary to Moultrie's allegation, the trial transcript establishes that Attorney Richards <u>did</u> challenge the sufficiency of the State's authentication of the audio recordings. Prior to introducing the recordings (and outside the presence of the jury), the State proffered the recordings. Attorney Richards objected for lack of sufficient authentication. (Ex. B at 311). The prosecutor indicated his intent to authenticate the recordings through Ms. Broughton's testimony. (*Id*. at 311, 340). During a recess shortly thereafter, however, Ms. Broughton disappeared from the courthouse. (*Id*. at 341-42). The State then proffered Officer Baggett's authentication of the recordings due to his familiarity with Moultrie's and Broughton's voices. (*Id*. at 342-45). Attorney Richards cross-examined Baggett and objected to the sufficiency of his authentication. (*Id*. at 345-47). The trial court overruled the objection. (*Id.* at 347). When the jury returned, the State presented Officer Baggett's authentication testimony and offered the recordings into evidence. (*Id*. at 349-52). Attorney Richards renewed her objection (*id*. at 352), but, again, the trial court overruled it. (*Id*.). Richards then attempted to discredit Baggett's authentication through cross-examination. (*Id*. at 352-54).

Given defense counsel's substantial efforts to exclude the recordings on the same basis Moultrie now proposes—lack of authentication—his claim is frivolous. Moultrie is not entitled to habeas relief on Ground Two.

**Ground Three**    **"Petitioner was denied his right to effective assistance of counsel as guaranteed under the 6th and 14th Amendments to the U.S. Constitution when counsel failed to move to suppress." (Doc. 1 at 8 in ECF)**

Moultrie claims Attorney Richards was ineffective for failing to move to suppress his statements to Investigator Baggett during a recorded interview on August 11, 2010, on the ground that Baggett failed to advise him of his *Miranda* rights. (Doc. 1 at 8-9 in ECF). *See Miranda v. Arizona*, 384 U.S. 436 (1966).[8] Moultrie also faults defense counsel for failing to seek suppression of his statement

---

[8] In *Miranda*, the Supreme Court established "certain procedural safeguards that require police to advise criminal suspects of their rights under the Fifth and Fourteenth Amendments before commencing custodial interrogation." *Duckworth v. Eagan*, 492 U.S. 195, 201 (1989). Intent on "giv[ing] concrete constitutional guidelines for law enforcement agencies and courts to follow," 384 U.S. at 441-42, *Miranda* prescribed the following four now-familiar warnings that must be provided prior to a custodial interrogation:

> [A suspect] must be warned prior to any questioning [1] that he has the right to remain silent, [2] that anything he says can be used against him in a court of law, [3] that he has the right to the presence of an attorney, and [4] that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

384 U.S. at 479.

to Lieutenant Blake on August 13, 2010, for lack of *Miranda* warnings. (*Id.* at 9 in ECF).

The State asserts that to the extent Moultrie faults counsel for failing to move to suppress his statement to Baggett, his claim is exhausted, but to the extent Moultrie challenges counsel's failure to move to suppress his statement to Blake, that aspect of his claim is procedurally defaulted because Moultrie did not exhaust it in his state postconviction proceeding. (Doc. 22 at 36-37). Moultrie replies that both aspects of his claim are exhausted, because had defense counsel moved to suppress his statement to Baggett, the motion would have "subsumed" his statement to Blake because the statements involved "a similar custodial interrogation." (Doc. 30 at 13-14).

The undersigned first addresses Moultrie's claim which the state does not dispute was exhausted, counsel's failure to move to suppress Moultrie's statement to Baggett.

> ### A.   Section 2254 Review of State Court's Decision Regarding Counsel's Failure to Move to Suppress Moultrie's Statement to Baggett

The parties agree that Moultrie presented his claim involving his statement to Investigator Baggett to the state courts as Ground One of his second amended Rule 3.850 motion. (Doc. 1 at 10 in ECF; Doc. 22 at 36). The parties also agree that the state circuit court denied the claim on the merits in a reasoned order, and that the

First DCA summarily affirmed without explanation. (Doc. 1 at 10 in ECF; Doc. 22 at 36-42). The First DCA's summary affirmance is entitled to deference under 28 U.S.C. § 2254(d). *See Richter*, 562 U.S. at 99, 100. Consistent with *Wilson*, this court "look[s] through" the First DCA's unexplained decision to the circuit court's reasoned order, and presumes that the First DCA adopted the same reasoning. *Wilson*, 138 S. Ct. at 1192.

Ground One of Moultrie's second amended Rule 3.850 motion claimed: "I.A.C. Where Counsel Failed To Move In Limine To Exclude Reference To Recorded Statement Made To Investigator Bagget [sic] Absent Miranda Warnings." (Ex. H at 181). Moultrie alleged that his statement to Baggett was inadmissible under *Miranda*, because "[t]hough Defendant appeared voluntarily for the interview[,] the in-station setting and the questions asked constituted a custodial setting implicating due process protections on the part of law enforcement." (*Id.* at 181-82). The recording of Moultrie's statement to Baggett was entered into evidence, as was a transcript of the statement. (Ex. B at 262-73).

The state circuit court held an evidentiary hearing on this claim (Ex. I at 228-65), and denied relief by written order. The order correctly identified *Strickland* as the controlling legal standard (Ex. I at 305), and denied relief for these reasons:

> Defendant claims that counsel was deficient for failing to make a motion to suppress Defendant's initial statement to police. *See* Defendant's statement in attached trial transcript excerpts, pp. 262-273.

Defendant claims that because he was not given *Miranda* warnings, that the statement should have been inadmissible.

To prove his claim, Defendant must demonstrate that the motion to suppress had merit.

A suspect is entitled to a *Miranda* warning during a custodial interrogation, "the key being that the suspect must be in custody." *Correll v. State*, 523 So. 2d 562, 564 (Fla. 1988) (holding that a suspect was not in custody when he was asked to go to the sheriff's office, voluntarily went, was interviewed for approximately an hour and then left). This inquiry "is approached from the prospective of how a reasonable person would have perceived the situation." *Roman v. State*, 475 So. 2d 1228, 1231 (Fla. 1985).

At trial, Investigator Chris Baggett testified that Defendant came to the sheriff's office "on his own free will" and was "willing to answer questions." *See* attached trial transcript excerpts, p. 262.

The Court convened an evidentiary hearing on this claim at which Defendant was present and represented by counsel.

At the hearing, Defendant's trial counsel, Kelly Richards, testified that it appeared clear the statement was voluntary. *See* evidentiary hearing transcript, p. 24. She further testified that Defendant had decided himself to go the sheriff's office, made a statement and then left. In fact, during the statement he said that he was going to go and get his phone and some shoes to show the investigators, indicating that he was under the impression that he would be able to leave. Importantly, Defendant was actually allowed to leave. *See Fitzpatrick v. State*, 900 So. 2d 495, 512 (Fla. 2005) ("that he indeed left the station at that point, afforded a reasonable basis for Fitzpatrick to believe that he was free to leave."). Additionally, Ms. Richards testified that Defendant never told her that the police allegedly told him he was not free to leave and had to give a statement. The Court finds Ms. Richards to be credible. Because counsel did not have a basis to file a motion to suppress Defendant's statement, she was not deficient for failing to do so. Therefore, Defendant is not entitled to relief on this claim.

(Ex. I at 305-06).

This court defers to the state court's factual findings, because they are amply supported by the record and because Moultrie has not rebutted them with clear and convincing evidence to the contrary. *See Consalvo v. Sec'y for Dep't of Corr.*, 664 F.3d 842, 845 (11th Cir. 2011) ("AEDPA affords a presumption of correctness to a factual determination made by a state court; the habeas petitioner has the burden of overcoming the presumption of correctness by clear and convincing evidence." (citing 28 U.S.C. § 2254(e))). This deference extends to the state court's determination that Attorney Richards's testimony was credible. "Determining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review. Federal habeas courts have 'no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them.'" *Consalvo*, 664 F.3d at 845 (quoting *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)).

Based on the state court's findings, fairminded jurists can concur in the conclusion that Moultrie's claim fails under clearly established federal law. When an ineffective assistance claim is based on a trial counsel's failure to file a timely motion to suppress, a petitioner must establish: "(1) that counsel's representation fell below an objective standard of reasonableness, (2) that the Fourth Amendment claim

is meritorious, and (3) that there is a reasonable probability that the verdict would have been different absent the excludable evidence." *Zakrzewski v. McDonough*, 455 F.3d 1254, 1260 (11th Cir. 2006) (citing *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986)).

The *Miranda* safeguards protect the individual against the coercive nature of custodial interrogation. The *Miranda* warnings are required, therefore, "only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). The standard for determining whether a suspect was "in custody" when interrogated is an objective one:

> Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest."

*Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (internal quotation marks, alteration, and footnote omitted); *see also Yarborough v. Alvarado*, 541 U.S. 652, 662-63 (2004); *Stansbury*, 511 U.S. at 323; *Berkemer v. McCarty*, 468 U.S. 420, 442, and n.35 (1984). Rather than demarcate a limited set of relevant circumstances, the Supreme Court requires law enforcement officers and courts to "examine all of the

circumstances surrounding the interrogation," *Stansbury*, 511 U.S. at 322, including any circumstance that "would have affected how a reasonable person" in the suspect's position "would perceive his or her freedom to leave." *Id.* at 325. The "subjective views harbored by either the interrogating officers or the person being questioned" are irrelevant. *Id.* at 323; *see also Alvarado*, 541 U.S. at 667 (emphasizing that the "actual mindset" of the particular suspect subjected to police questioning is not considered).

In his recorded statement to Baggett, Moultrie confirmed that he came to the sheriff's office voluntarily. (Ex. B at 264 (trial transcript); Ex. H, p. 206 (transcript of statement)). Although Moultrie testified at the postconviction evidentiary hearing that Investigator Baggett told him in a prior unrecorded conversation that he could not leave the sheriff's office and that he had to make a recorded statement, (Ex. I at 232), Moultrie did <u>not</u> testify that he conveyed this information to Attorney Richards. (*See id*. at 4-8).

Attorney Richards testified at the postconviction evidentiary hearing that Moultrie never told her that Investigator Baggett (or anyone else) advised Moultrie that he could not leave the sheriff's office and had to make a statement. (Ex. I at 250-51). Richards also testified that during Investigator Baggett's pre-trial deposition, Baggett testified that Moultrie came voluntarily to the sheriff's office and that he

voluntarily provided a statement. (*Id.* at 251).[9] Baggett's deposition testimony was consistent not only with Moultrie's verbal confirmation on the recorded statement, but also with Moultrie's offer, during his recorded statement, to return to the sheriff's office and bring some items he thought might clear him of suspicion (shoes and a cell phone). (*Id.*). Attorney Richards testified that given all the information she had about Moultrie's statement, she did not believe she had a good-faith basis to file a motion to suppress. (*Id.*).

Based on the record before the state court, it was neither contrary to, nor an unreasonable application of the *Strickland* standard to conclude that Attorney Richards was not ineffective for failing to move to suppress Moultrie's statement to Baggett. *See Strickland*, 466 U.S. at 691 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or action. Counsel's actions are usually based . . . on information supplied by the defendant."). Moultrie is not entitled to habeas relief on this claim.

**B.    Moultrie's Claim that Counsel was Ineffective for Failing to Move to Suppress His Statement to Lieutenant Blake is Procedurally Defaulted and Without Merit**

Moultrie's habeas petition also claims that Attorney Richards was ineffective for failing to move to suppress his <u>unrecorded</u> statement to <u>Lieutenant Blake</u> on

---

[9] Baggett's deposition testimony was consistent with his trial testimony. (Ex. B at 262).

<u>August 13, 2010</u>, wherein Moultrie told Blake "I didn't mean to do it." (Doc. 1 at 9 in ECF). Moultrie argues that Blake's trial testimony establishes that the statement was made during a custodial interrogation. (*Id*.).

At trial, Lieutenant Blake testified:

Q [by the State].    On August 13th, did you have contact with Mr. Moultrie?

A [Lieutenant Blake].    Yes, sir.

Q.    He came up and he turned himself in there at the sheriff's office; is that accurate?

A.    Yes, sir.

Q.    Were you the one that made contact with him then?

A.    Yes, sir. I made contact with him in the lobby.

Q.    Tell me what happened after that.

A.    I went ahead and handcuffed him, and I walked him around back to the booking desk. And on my way back there, I made a comment to him.

Q.    What comment did you make to him?

A.    I made a comment. I said, it's a good thing you turned yourself in. That way we're not bothering your family.

Q.    Did he make any comments in exchange?

A.    Yes, sir.

Q.    What did he say?

A.    He said, I didn't mean to do it.

(Ex. B at 376-77).

The State responds that this claim is procedurally barred from habeas review because Moultrie failed to present it to the state postconviction trial court in his second amended Rule 3.850 motion. (Doc. 22 at 36-37). Moultrie replies that his claim was "subsume[d]" within his claim concerning counsel's failure to suppress his statement to Baggett, because "it involves a similar custodial interrogation against the Petitioner." (Doc. 30 at 13).

The record establishes that Ground One of Moultrie's second amended Rule 3.850 motion faulted counsel for failing to move to suppress only his <u>August 11, 2010, recorded statement</u> <u>to Investigator Baggett</u>. Moultrie's Ground One did not mention his <u>August 13, 2010, unrecorded statement</u> to <u>Lieutenant Blake</u>, much less fault counsel for failing to suppress it. (Ex. H at 181-82 (postconviction motion)). Similarly, Moultrie's presentation of evidence at his postconviction evidentiary hearing, where he was represented by counsel, was confined to Attorney Richards's failure to move to suppress his statement to Baggett. (Ex. I at 228-65 (evidentiary hearing transcript)). The state circuit court's order denying relief was confined to Moultrie's statement to Baggett.

Moultrie appealed and, in his initial brief sought to raise for the first time the issue concerning his statement to Lt. Blake. Moultrie conceded, however, that he

failed to present the claim to the postconviction trial court and that it was not preserved for appellate review. (Ex. J at 14). The State answered that the issue was procedurally barred from appellate review because it was not preserved below. (Ex. K at 7). The First DCA summarily affirmed.

As noted previously, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court has adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter*, 562 U.S. at 99. However, "[t]he presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 99-100. "While the *Richter* presumption is a strong one that may be rebutted in unusual circumstances, it is not irrebuttable." *Johnson v. Williams*, 568 U.S. 289, 302 (2013).

The State has rebutted the *Richter* presumption by demonstrating that it is more likely the First DCA rejected Moultrie's claim on state-law procedural principles. "A party cannot raise a new claim for the first time in an appeal from a post-conviction motion in a Florida appellate court." *Harris v. Sec'y, Fla. Dep't of Corr.*, 709 F. App'x 667, 668 (11th Cir. 2018) (citing *Mendoza v. State*, 87 So. 3d 644, 660 (Fla. 2011)). "An argument is cognizable on appeal in Florida only when the contention before the appeals court is the same 'specific contention asserted as

legal ground for the objection, exception, or motion' in the trial court." *Harris,* 709 F. App'x at 668 (quoting *Hutchinson v. State*, 17 So. 3d 696, 703 n.5 (Fla. 2009)).

The Eleventh Circuit's decision in *Harris*, involved an ineffective assistance claim in an identical procedural posture as Moultrie's claim. Petitioner Harris sought habeas relief under § 2254 for counsel's failure to discuss the law regarding confinement status (whether work release was considered confinement under Florida's escape statute) and how it applied to the facts of Harris's case prior to his entry of a guilty plea. *Harris*, 709 F. App'x at 668. Harris, however, had not raised that issue in his state postconviction motion. Harris's state postconviction motion claimed that counsel was ineffective for failing to advise him of two other areas of Florida law. *Id.* The first time Harris raised the issue of counsel failing to discuss the law concerning confinement status was in his postconviction appeal. *Id*. at 668-69. The First DCA summarily affirmed the denial of postconviction relief. *Harris v. State*, 130 So. 3d 1280 (Fla. 1st DCA 2013). The Eleventh Circuit concluded that the claim was procedurally defaulted on habeas review:

> [A]s it was raised for the first time on appeal, Harris's confinement argument was not cognizable in Florida courts. Because Harris deprived the Florida courts from being able to apply the law to the facts of his claim, and because he raised the argument for the first and only time in a procedural context in which the merits are not normally considered, Harris did not fairly present his claim to the Florida courts. Therefore, Harris has not satisfied the exhaustion requirement.

*Harris*, 709 F. App'x at 669 (footnote omitted). The limitations period on Rule 3.850 motions had passed. *Id.* at 669 n.1.

Based on the circumstances of this case and Florida law, it is almost certain that the First DCA rejected Moultrie's unpreserved ineffective assistance claim concerning counsel's failure to move to suppress Moultrie's statement to Blake on the independent and adequate state procedural ground that the argument was not cognizable on appeal because Moultrie failed to raise it below and the postconviction trial court had not addressed it. *See Green v. State*, 975 So. 2d 1090, 1104 (Fla. 2008) (holding that defendant's ineffective assistance claim was procedurally barred because he did not raise it in his postconviction motion and it was not addressed by the trial court); *Hutchinson*, 17 So. 3d at 703 n.5 (concluding that defendant's ineffective assistance claim was not cognizable in the postconviction appeal "because it is being raised for the first time."); *Henyard v. State*, 883 So. 2d 753, 759 (Fla. 2004) ("Initially, we would note that this specific claim was not made in [the defendant's] postconviction motion, and therefore it is procedurally barred."); *Doyle v. State*, 526 So. 2d 909, 911 (Fla. 1988) (holding that defendant's postconviction claim was "procedurally barred because it was not presented to the trial court in Doyle's rule 3.850 motion and cannot be raised for the first time in this appeal.").

Moultrie makes none of the requisite showings to excuse his procedural default. Moultrie's procedural default bars federal habeas review of his claim concerning suppression of his statement to Lieutenant Blake.

Furthermore, even if the First DCA's decision were considered a rejection of Moultrie's claim on the merits, he is not entitled to habeas relief because the First DCA's decision is consistent with clearly established federal law. Interrogation occurs "whenever a person in custody is subjected to either express questioning or its functional equivalent," which refers to words or actions that the police should know are reasonably likely to elicit an incriminating response. *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). Voluntary incriminating statements not made in response to an officer's questioning are admissible. *See United States v. Suggs*, 755 F.2d 1538, 1541-42 (11th Cir. 1985); *see also Miranda*, 384 U.S. at 478 ("Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.").

Fairminded jurists could conclude that Lieutenant Blake's comment, "It's a good thing you turned yourself in. That way we're not bothering your family," was not express questioning or the functional equivalent of questioning, because it was not reasonably likely to elicit an incriminating response. Thus, Attorney Richards was not ineffective for failing to move to suppress Moultrie's statement, "I didn't mean to do it." Moultrie is not entitled to habeas relief on Ground Three.

Page 45 of 69

**Ground Four**          **"Petitioner was denied his right to effective assistance of counsel as guaranteed under the 6th and 14th Amendments to the U.S. Constitution when counsel failed to present an alibi defense." (Doc. 1 at 11 in ECF)**

Moultrie claims Attorney Richards was ineffective for failing to present testimony from two alibi witnesses, Kenneth Tavares Turner and Janay Broughton. (Doc. 1 at 11-14). Moultrie alleges that Turner and Broughton would have testified that he was with them at the Truman Arms apartment complex at the time Mr. Peters was robbed and killed. (*Id.* at 11). Moultrie alleges that Attorney Richards subpoenaed Turner for trial; told the court on the first day of trial that she intended to call three witnesses including Turner and Broughton; and told the jury during opening statements that they would hear from alibi witnesses. Richards, however, did not call Turner or Broughton to testify. (*Id.*).

The parties agree that Moultrie presented this claim to the state court as Ground Nine of his second amended Rule 3.850 motion; that the state circuit court denied relief on the merits in a reasoned order; and that the First DCA summarily affirmed without explanation. (Doc. 1 at 14-15 in ECF; Doc. 22 at 46-47). The First DCA's summary affirmance is an "adjudication on the merits" entitled to deference under 28 U.S.C. § 2254(d). *See Richter*, 562 U.S. at 99, 100. Consistent with *Wilson*, this court "look[s] through" the First DCA's unexplained decision to the circuit

court's reasoned order, and presumes that the First DCA adopted the same reasoning.

*Wilson*, 138 S. Ct. at 1192.

The state circuit court's order correctly identified *Strickland* as the controlling

legal standard (Ex. I at 305), and denied relief as follows:

> Next, Defendant claims that counsel was deficient for failing to call Janay Broughton and Kenneth Turner to testify as alibi witnesses for Defendant at trial. The record reflects that the murder occurred at 10:00 P.M. Defendant claims that at that time, he was sitting on the steps in front of Ms. Broughton's apartment with Mr. Turner. The Court convened an evidentiary hearing on this claim at which both Ms. Broughton and Mr. Turner testified.

> At the hearing, Mr. Turner testified that he was with Defendant on the night of the murder "around 8:00 or 9:00 . . . for at least an hour or two," but added, "I can't just sit here and say no time. I don't want to be wrong either, so I just can't pinpoint it." *See* evidentiary hearing transcript, pp. 15-16. Ms. Richards testified that she had subpoenaed both Mr. Turner and Ms. Broughton to testify at the trial, but at the time of the defense case, neither witness was present. *See* evidentiary hearing transcript, pp. 27-29. She further testified that she discussed the options at that point in the trial with Defendant and he said, "don't worry about them." *See* evidentiary hearing transcript, p. 30; *see also* attached trial transcript excerpts, pp. 381–382. ("I need to have a little bit more of a discussion with my client, Your Honor. We potentially had three witnesses, but I'm not sure we're going to call any of them at this point.")

> Additionally, Clint Merritt, the investigator from the Office of the Public Defender who worked on this case, testified at the evidentiary hearing that when he contacted Mr. Turner before the trial, "he was very vague. It was obvious he did not want to be involved." *See* evidentiary hearing transcript, p. 33. Mr. Merritt confirmed that he had personally served Mr. Turner with a subpoena to testify at the trial, but Mr. Turner never appeared that day. *See* evidentiary hearing transcript, p. 34.

On the other hand, Ms. Broughton had been waiting outside the courtroom during the trial. However the record reflects that after recordings of phone calls between Defendant (who was in jail) and Ms. Broughton were played for the jury, she suddenly could not be located. *See* attached trial transcript excerpts, p. 342 ("a couple of guys went outside and whispered in Ms. Broughton's ear. She got up and hightailed it out of here.") As Ms. Richards testified at the evidentiary hearing, "the phone call was really a turning point in the case." *See* evidentiary hearing transcript, p. 31. During the call, Defendant was speaking to Ms. Broughton and others on the line about trying to prevent Felicia Thomas from testifying. *See* attached trial transcript excerpts, pp. 290-294. ("We need to put this ho [sic] in the trunk or something.").

Nevertheless, Ms. Broughton testified at the evidentiary hearing that during the time frame of the murder, Defendant had been sitting on the steps outside her apartment, but that she could not see him because she was taking care of her baby. *See* evidentiary hearing transcript, pp. 20-21. She conceded that it was possible that Defendant left and came back without her knowing. Because her testimony would not have established an alibi, Defendant was not prejudiced by the lack of her testimony.

Moreover, although the defense tried to argue that Defendant had bought clothing from the victim's trunk previously, Defendant's fingerprints at the scene of the murder were strong evidence of his participation in the crime. *See* attached trial transcript excerpts, pp. 167-172. Defendant has failed to demonstrate that any further action by counsel would have changed the outcome of the proceedings, and therefore, he is not entitled to relief.

(Ex. I at 311-13).

The state court's factual findings, including its credibility determinations, are amply supported by the record and are presumed correct. Based on the record, fairminded jurists can concur in the state court's conclusion that Attorney Richards's

decision, in consultation with Moultrie, not to bring Turner and Broughton back to court to testify was reasonable and, therefore, that Moultrie failed to show deficient performance.

Fairminded jurists also can concur in the state court's conclusion that Moultrie failed to establish prejudice. Considering the weak (if not non-existent) alibi-value of Turner's and Broughton's testimony, the damaging effect of the State's likely impeachment of Broughton with her recorded phone conversations with Moultrie, and the substantial evidence of Moultrie's participation in the crime, it is highly unlikely that the jury's verdict would have been different had either or both of these witnesses testified. Moultrie is not entitled to federal habeas relief on Ground Four.

**Ground Five**        **"Petitioner was denied his right to effective assistance of counsel as guaranteed under the 6th and 14th Amendments to the U.S. Constitution when counsel failed to move to prevent introduction of a gruesome photograph." (Doc. 1 at 17 in ECF)**

Moultrie alleges that four photographs of the victim's injuries were admitted at trial through the medical examiner's testimony. (Doc. 1 at 17 in ECF (referencing State's Exhibits 6, 7, 12, and 13)). Moultrie asserts that a fifth photograph, State's Exhibit 14, was also admitted, but it was cumulative, inflammatory, and unduly prejudicial because it was "a gruesome picture of a rod shoved all the way through

the victim's head, with the scalp peeled back and brain cavity exposed." (*Id.*).[10]

Moultrie faults trial counsel for failing to object on the ground that the probative value of that photograph was outweighed by its prejudicial effect. (*Id.*). Moultrie argues that had counsel objected, the trial court would have sustained the objection and the jury would not have seen the photograph. (*Id.*).

The parties agree that Moultrie presented this claim to the state courts as Ground Two of his second amended Rule 3.850 motion; that the state circuit court denied relief on the merits; and that the First DCA summarily affirmed without explanation. (Doc. 1 at 17 in ECF; Doc. 22 at 59-60). The First DCA's summary affirmance is an "adjudication on the merits" entitled to deference under 28 U.S.C. § 2254(d). *See Richter*, 562 U.S. at 99, 100. Consistent with *Wilson*, this court "look[s] through" the First DCA's unexplained decision to the circuit court's reasoned order, and presumes that the First DCA adopted the same reasoning. *Wilson*, 138 S. Ct. at 1192.

The state circuit court's order correctly identified *Strickland* as the controlling legal standard (Ex. I at 305), and denied relief as follows:

> Next, Defendant claims that counsel should have objected to the State's exhibit 14, which Defendant claims was an unnecessarily graphic autopsy photo.

---

[10] The photograph appears in the record at Doc. 22, Ex. A at 82.

Florida law permits the admission of relevant autopsy photos. *See* section 90.402, Florida Statutes. Furthermore, the admission of "particularly gruesome photographs" can be relevant and proper so long as the trial court exercises caution in admitting them and limits their numbers. *See Kalisz v. State*, 124 So. 3d 185, 210 (Fla. 2013) (citing *Larkins v. State*, 655 So. 2d 95, 98 (Fla. 1995)).

The record reflects that nine autopsy photos were admitted at trial, and the medical examiner described what each photo depicted. *See* attached trial transcript excerpts, pp. 69-80. Although Defendant contends that the victim was "posed in a shocking manner," Exhibit 14 shows the victim, from the neck up, lying on the examination table with a block holding his head level to his body in a natural position. As the medical examiner explained, she had already "opened the scalp and taken out the brain," in order to "cut a hole around the entrance wound," and examine it under a microscope. The cut in the scalp was visible and revealed some of the victim's brain. However, it was not bloody or gruesome. Additionally, the photo also shows a "probe," or a thin metal rod, that was placed through the gunshot wound which passed in one side of his head and out the other. As Dr. Minyard explained, the purpose of the photo was "to show the directionality of the wound and the bullet." *See* attached trial transcript excerpts, p. 80.

The Court finds that the photo was relevant to illustrate the testimony of the medical examiner as to the nature and location of the wounds and the manner of death. Moreover, Defendant cannot conclude that he was found guilty merely due to the jury's alleged shock at graphic autopsy photos. As an objection was not warranted, Defendant is not entitled to relief on this claim.

(Ex. I at 306-07).

The state court concluded, as a matter of state law, that the photograph was admissible and the defense had no basis to object. When the state courts have already answered the question of how an issue would have been resolved under that state's law had defense counsel done what the petitioner argues he should have done,

"federal habeas courts should not second-guess them on such matters" because "it is a fundamental principle that state courts are the final arbiters of state law*." Callahan v. Campbell*, 427 F.3d 897, 932 (11th Cir. 2005) (quotation marks omitted).  Because this court will not "second guess" the state court's conclusion that the photograph was admissible under Florida law, Moultrie cannot demonstrate his counsel was deficient for failing to object. *See id.* A lawyer cannot be deficient for failing to raise a meritless objection. *Meders*, 911 F.3d at 1354.

Moreover, the state court reasonably determined that Moultrie could not satisfy *Strickland*'s prejudice prong. Moultrie not only failed to show a reasonable probability the objection would have been sustained and the photograph excluded, he failed to make the more critical showing that <u>the outcome of his trial</u> probably would have been different had the photograph been excluded.

The state court's rejection of this claim was neither contrary to, nor an unreasonable application of, the *Strickland* standard. Moultrie is not entitled to habeas relief on Ground Five.

**Ground Six**     **"Petitioner was denied his right to effective assistance of counsel as guaranteed under the 6th and 14th Amendments to the U.S. Constitution when counsel failed to argue a reasonable scenario in support of reasonable doubt on whether or not Petitioner was an active participant in the alleged robbery." (Doc. 1 at 18 in ECF)**

Moultrie notes that although the State charged him and Hickenbotham with felony murder predicated on robbery, the State did not charge either of them with a separate count of robbery. (Doc. 1 at 17-19 in ECF). Moultrie contends that the State's case was too weak to support a separate robbery charge, and that the only evidence of a robbery was the testimony of Mr. Peters's girlfriend (Ms. Merritt) that after the shooting, she noticed Mr. Peters's necklace and other items were missing. (*Id.*).

Moultrie claims that defense counsel was ineffective for failing to "use[ ] the evidence in this case to cast reasonable doubt on whether or not Petitioner, or his co-defendant committed robbery, in order to support felony murder." (Doc. 1 at 18 in ECF). Specifically, Moultrie contends that counsel should have emphasized in closing arguments that: (1) it was unreasonable to determine that Moultrie or Hickenbotham took items from Mr. Peters or his car because no one saw either of them remove anything; (2) the testimony of State's witness Cordaroll Dixon created reasonable doubt about whether it was he, and not Moultrie or Hickenbotham, who stole Mr. Peters's necklace and items from his car. (*Id.*).

Moultrie describes a portion of Cordaroll Dixon's trial testimony wherein he stated that he was at the Exxon station the night of the murder, he left his cell phone there, and he walked to the area where Mr. Peters was lying and saw that he was injured. (*Id.* at 18 in ECF; *see also* Doc. 22, Ex. B at 153-57 (Dixon's trial testimony)). Moultrie contends that had counsel made his proposed reasonable-doubt argument to the jury, there is a reasonable probability the outcome of his trial would have been different. (Doc. 1 at 18-19 in ECF).

Moultrie concedes that "[t]his claim was not exhausted in state court." (Doc. 1 at 19 in ECF). He argues that "any suggestion of procedural default should be excused through application of *Martinez v. Ryan*." (*Id.* at 19 in ECF; *see also* Doc. 30 at 17-18) (referencing *Martinez v. Ryan*, 566 U.S. 1 (2012)). The State asserts that this claim is procedurally defaulted and that Moultrie fails to establish entitlement to *Martinez*'s equitable exception. (Doc. 22 at 66-73).

### A.    The *Martinez* Exception

As previously discussed, a federal court may consider the merits of a procedurally defaulted claim only if the petitioner establishes both "cause" for the default and "prejudice" from the alleged violation of his constitutional right. *Wainwright v. Sykes*, 433 U.S. 72, 84-85 (1977). To establish cause, a petitioner must "demonstrate 'some objective factor external to the defense' that impeded his

effort to raise the claim properly in state court." *Ward v. Hall*, 592 F.3d 1144, 1157 (11th Cir. 2010) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).

Prior to *Martinez*, habeas petitioners were barred from establishing cause by relying on errors made by their state postconviction counsel. *See Coleman*, 501 U.S. at 752-53. In *Martinez*, however, the Supreme Court created a limited, equitable exception to *Coleman* where: (1) "a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding," as opposed to on direct appeal; (2) "appointed counsel in the initial-review collateral proceeding . . . was ineffective under the standards of *Strickland* "; and (3) "the underlying ineffective-assistance-of-trial-counsel claim is a substantial one." *Martinez*, 566 U.S. at 14 (citations omitted).

To satisfy *Martinez*'s third prong, the petitioner "must . . . demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez*, 566 U.S. at 14 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)) (describing the standard for issuance of a certificate of appealability). The Eleventh Circuit construes the Supreme Court's citation to *Miller-El* "to mean that it intended that lower courts apply the already-developed standard for issuing a COA, which requires 'a substantial showing of the denial of a constitutional right.' 28 U.S.C. § 2253(c)(2)." *Hittson*, 759 F.3d at 1269. A petitioner satisfies the COA standard "by

Page 55 of 69

demonstrating . . . that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327.

### B.   Moultrie Fails to Satisfy *Martinez*'s Third Prong

Moultrie fails to demonstrate that his ineffective assistance of trial counsel claim is "substantial" and has "some merit." *Martinez*, 566 U.S. at 14. To provide context, the undersigned outlines the entirety of Cordaroll Dixon's testimony.

Dixon testified that he arrived at the Exxon station "later on" the night of the shooting. (Ex. B at 153-54). The prosecutor asked Dixon what was going on outside the gas station when he arrived, and Dixon answered, "Nothing that I really seen. I went into the store. People in the store was on the phone with the police and when I came back out, I seen a white female [Ms. Merritt] like screaming and crying." (*Id.* at 154). Ms. Merritt asked for help, so Dixon walked over to the car wash area where the victim was lying. (*Id.*). Dixon looked at the body, then left. (*Id.*). When Dixon arrived home, he realized his cell phone was missing. (*Id.* at 155-56). Dixon's cell phone had fallen out of his lap when he exited his car at the Exxon station. (*Id.* at 155). Dixon testified that he knew Moultrie, but he did not know Omar Hickenbotham. (*Id.*). Dixon did not see, nor was he with, either of them that night. (*Id.*). On cross-examination, Dixon testified that he was driving a white car that night. (*Id.* at 155).

The State's fingerprint expert, Scott Glazebrook, testified that he received fingerprint standards from Cordaroll Dixon, among others. (*Id.* at 167, 168). Of the 83 fingerprint lifts Glazebrook examined, 33 were of value. (*Id.* at 167). None of the fingerprints recovered from the scene matched Cordaroll Dixon's fingerprints. (*Id.* at 168-69).

During closing, the prosecutor argued that Cordaroll Dixon was not involved in the crime. (Ex. B at 430-31). The prosecutor acknowledged that more than two people were involved in the murder and robbery—the two men who took Mr. Peters from the trunk to the car wash, stole one of his gold necklaces and shot him; the additional person(s) who pilfered items from the trunk, and possibly another person who moved the getaway car. (*Id.* at 434). The prosecutor argued that based on the evidence presented—including the fingerprints, the DNA evidence, Moultrie's statements to law enforcement, the recordings of Moultrie's phone calls, and the testimony of Felicia Thomas, Dashia Laster, and Markellia Simpkins—two of the men involved in the felony murder were Moultrie and Hickenbotham. (*Id.* at 434-48).

Attorney Richards argued that the evidence suggested several suspects, including Cordaroll Dixon, but investigators inexplicably excluded them as suspects. (Ex. B at 458-68). Specifically with regard to Cordaroll Dixon, Attorney Richards argued:

Cordaroll Dixon. I believe . . . that he said when he first got there, there was nothing going on. But he went inside the store, heard that they were calling 911. He said he knew Tyrone; he hadn't seen him there. He had two phones. One was in his lap, one was around his neck. He did lose a cell phone at the scene. But interesting, he said nothing was going on when he first got there.

. . . .

Cordaroll Dixon. Valerie [Merritt] said that one of the guys had a cell phone around his neck. But Dixon said that, you know, he was there after whatever happened. He was excluded as a suspect.

(Ex. B at 459-60, 466).

Moultrie cannot show that Attorney Richards's performance was deficient under *Strickland*'s objective standard, because she <u>did</u> argue to the jury that Dixon's testimony raised questions about his possible involvement in the crime. Although counsel did not make the more detailed and direct argument Moultrie proposes, she urged the jury to question the veracity of Dixon's testimony and his exclusion as a suspect.

Moultrie likewise fails to satisfy *Strickland*'s prejudice prong. Moultrie's claim focuses exclusively on counsel's failure to argue that Dixon's testimony created reasonable doubt about "whether or not Petitioner or his co-defendant <u>actually robbed</u> the victim." (Doc. 1 at 19 in ECF; *see also id*. at 17-19 in ECF) (emphasis added). Moultrie's felony murder charge, however, was not predicated solely on his and Hickenbotham's "actually robbing" Peters. Moultrie was guilty

even if he and Hickenbotham were <u>attempting to rob</u> Peters. *See* Fla. Stat. § 782.04(1)(a)(2) (felony murder statute); *see also* Ex. A at 36-37, 39-40, 43 (jury instructions).

Counsel's failure to make Moultrie's proposed reasonable doubt argument (that he and Hickenbotham took nothing and that Dixon likely took the clothing and necklace <u>after</u> the shooting) does not undermine confidence in the jury's verdict, because even if the jury would have been persuaded by that argument, Moultrie still would have been liable as a principal for Hickenbotham murder of Mr. Peters while he and Moultrie were <u>attempting</u> to rob him. This shortcoming in Moultrie's claim is significant, given the overwhelming evidence of Moultrie's participation with Hickenbotham in <u>at least</u> an attempted robbery of Mr. Peters at the time Hickenbotham killed him.

Because Moultrie cannot show that there is a reasonable probability that the jury would have acquitted him of felony murder (predicated on attempted robbery), had counsel made his proposed argument, his claim is not "substantial" and does not excuse his procedural default. Ground Six, therefore, should be denied as procedurally defaulted.

**<u>Ground Seven</u>**     **"Petitioner was denied his right to effective assistance of counsel as guaranteed under the 6th and 14th Amendments to the U.S. Constitution when counsel failed to call Wiley Harper as a defense witness." (Doc. 1 at 19 in ECF)**

Moultrie faults trial counsel for failing to call Wiley Harper as a defense witness. Moultrie alleges that Harper would have testified that Mr. Peters was killed by only one assailant, not two. Moultrie extrapolates this claim from Harper's statement to law enforcement, but does not provide a copy of that statement. (Doc. 1 at 19). According to Moultrie, Harper's testimony would have supported Moultrie's alternative defenses that "either (1) Petitioner was not present at the scene at all, or (2) if present, Petitioner did not participate in the crime and may not have known of Omar's plan to rob and kill the victim." (*Id.*). Moultrie contends that Harper's testimony also would have impeached Ms. Merritt's testimony that she saw two assailants. (*Id.*). Moultrie claims that there is a reasonable probability he would have been acquitted had defense counsel called Mr. Harper to testify. (*Id.* at 19-20 in ECF).

The parties agree that Moultrie presented this claim to the state courts as Ground Eight of his second amended Rule 3.850 motion, that the state circuit court denied relief on the merits in a reasoned order, and that the First DCA summarily affirmed without explanation. (Doc. 1 at 20 in ECF; Doc. 22 at 75-77). The First DCA's summary affirmance is an "adjudication on the merits" entitled to deference

under 28 U.S.C. § 2254(d). *See Richter*, 562 U.S. at 99, 100. Consistent with *Wilson*, this court "look[s] through" the First DCA's unexplained decision to the circuit court's reasoned order, and presumes that the First DCA adopted the same reasoning. *Wilson*, 138 S. Ct. at 1192.

Moultrie's claim in state court relied on this purported excerpt from Mr. Harper's statement to police:

> A [by Wiley Harper]:  All right . . . I don't know what car or what (inaudible) the only thing I seen, I seen a gun and I seen a person and he shot him.
>
> Q:  Okay, let's back up a little bit?
>
> A:  He shot around four (4) times.
>
> . . . .
>
> Q:  What kind of gun was it?
>
> A:  I don't know, . . .
>
> Q:  Do you know the difference between guns?
>
> A:  Yeah.
>
> Q:  What kind, what kind do you think it was?
>
> A:  I think it was an automatic.
>
> Q:  When he was pointing and shooting the gun, who was he shooting it at?
>
> A:  He was shooting it at the man who was uh, who was selling clothes.

> Q:  Okay, why was he shooting at him?
>
> A:  I don't know what they're [sic] problem was, I don't know. I just know that it was a person holding the gun and it was fired four (4) times . . . I don't know the name.
>
> Q:  . . . did they argue?
>
> A:  I heard a discussion or something like that.
>
> Q:  Well, what . . .
>
> A:  But they was arguing over something.  I don't know when, but they was [sic] arguing and that was it.  I don't know what was actually said.
>
> . . . .
>
> Q:  Why did, did the guy just get out of the car with a gun or was there . . .
>
> A:  I don't know where he get the gun from.  I just don't know, the only thing I know is he had a gun and it was fired four (4) times and that was it . . . . I don't know the relationship that they have or anything like that, I don't know his name or . . . .
>
> Q.  Okay.

(Ex. H at 192-93).

The state circuit court's order correctly identified *Strickland* as the controlling

legal standard (Ex. I at 305), and denied relief as follows:

> Defendant claims that counsel was deficient for failing to call Willie [sic] Harper to testify as a witness at trial. Defendant claims that a portion of a statement made by Mr. Harper to the police demonstrates that the murder was committed by only one person. The statement is

not found in the record before this Court. However, even accepting Defendant's recitation of the statement as true, Mr. Harper did not say that he only saw one person. In fact, it appears that Mr. Harper said "I don't know" eleven times in this short excerpt of his statement. The Court does not find that Defendant was prejudiced by the lack of Mr. Harper's testimony. Therefore, this claim is denied.

(Ex. I at 311).

The state court's factual finding, that Mr. Harper did not say he saw only one person at the crime scene, is a reasonable reading of the excerpt Moultrie provided. Based on this finding, fairminded jurists can concur in the conclusion that Moultrie failed to establish a reasonable probability the jury's verdict would have been different had Harper testified. *See Richter*, 562 U.S. at 112 (holding that *Strickland*'s prejudice prong requires that "[t]he likelihood of a different result must be substantial"); *Reaves v. Sec'y, Fla. Dep't of Corr*., 717 F.3d 886, 889, 902 (11th Cir. 2013). Moultrie is not entitled to habeas relief on Ground Seven.

**Ground Eight**   **"Petitioner was denied his right to effective assistance of counsel, due process and a fair proceeding as guaranteed under the 6th and 14th Amendments to the U.S. Constitution when the trial court held an inadequate *Nelson* hearing."[11] (Doc. 1 at 20 in ECF)**

Moultrie's reply concedes that Ground Eight does not warrant federal habeas relief. (Doc. 30 at 22). Accordingly, this claim is denied as withdrawn/waived.

---

[11] *See Nelson v. State*, 274 So. 2d 256 (Fla. 4th DCA 1973) (prescribing Florida's procedure for addressing a criminal defendant's request to discharge his trial counsel).

**Ground Nine**      <u>**"Petitioner was denied his right to effective assistance of counsel as guaranteed under the 6th and 14th Amendments to the U.S. Constitution based on the cumulative effect of counsel's deficient performance and ensuing prejudice." (Doc. 1 at 21 in ECF)**</u>

Moultrie's final claim states in total:

Petitioner simply states that when considering the totality of circumstances, the cumulative effect of counsel's deficient performance and ensuing prejudice denied Petitioner his rights to effective assistance of counsel, due process, and a fair trial as guaranteed by the 6th and 14th amendments to the U.S. Constitution. Therefore, the verdict in this case has been undermined, and a new trial is warranted.

(Doc. 1 at 21 in ECF).

The parties agree that Moultrie raised this claim as Ground Ten of his second amended Rule 3.850 motion, the state circuit court denied relief because none of Moultrie's individual ineffective assistance claims had merit, and that the First DCA summarily affirmed. (Doc. 1 at 21 in ECF; Doc. 22 at 88-89). The State argues that Moultrie is not entitled to habeas relief because he cannot satisfy § 2254(d)'s demanding standard.

Habeas relief is not warranted for several reasons. As the State correctly points out, the Eleventh Circuit, in rejecting a similar "cumulative effect" argument made by a § 2254 petitioner, recognized that: "The Supreme Court has not directly addressed the applicability of the cumulative error doctrine in the context of an ineffective assistance of counsel claim." *Forrest v. Fla. Dep't of Corr.*, 342 F. App'x

560, 564 (11th Cir. 2009). The *Forrest* panel noted further: "[h]owever, the Supreme Court has held, in the context of an ineffective assistance claim, that 'there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt.'" *Id.* at 564-65 (quoting *United States v. Cronic*, 466 U.S. 648, 659 n.26 (1984)).

At the outset, Moultrie has not sufficiently pled facts that would establish prejudice—cumulative or otherwise. (Doc. 1 at 21 in ECF; Doc. 30 at 22-23). Second, in light of *Cronic* and the absence of Supreme Court precedent applying the cumulative effect/error doctrine to claims of ineffective assistance of counsel, the state court's rejection of Moultrie's claim is not contrary to or an unreasonable application of clearly established federal law. *See Wright v. Van Patten*, 552 U.S. 120, 126 (2008) ("Because our cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established federal law."); *Schriro v. Landrigan*, 550 U.S. 465, 478 (2007) (holding that the state court did not unreasonably apply federal law because "we have never addressed a situation like this."); *Reese v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d 1277, 1287-88 (11th Cir. 2012) ("The Supreme Court has reiterated, time and again, that, in the absence of a clear answer—that is, a holding by the Supreme Court—about an issue of federal law, we cannot say that a decision

Page 65 of 69

of a state court about that unsettled issue was an unreasonable application of clearly established federal law."); *see also Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012) (declining to decide whether, under the current state of Supreme Court precedent, cumulative error claims reviewed through the lens of AEDPA can ever succeed in showing that the state court's decision on the merits was contrary to or an unreasonable application of clearly established law).

Third, Moultrie's "cumulative effect" claim has no merit because even reviewing his claim in the context of his entire petition, he has not shown any actual errors committed by his trial counsel, as discussed above. Because there are no errors to accumulate, Moultrie cannot prevail on his cumulative-error claim.   *See Insignares v. Sec'y, Fla. Dep't of Corr.*, 755 F.3d 1273, 1284 (11th Cir. 2014) ("Because we have found no error . . . Insignares has failed to show that the state judge lacked a reasonable basis to deny him cumulative-error claim."); *Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012) (concluding that there can be no cumulative error where there is no error found in the trial court's rulings); *United States v. Waldon*, 363 F.3d 1103, 1110 (11th Cir. 2004) (holding that where there is no error or only a single error, there can be no cumulative error).

For all of the foregoing reasons, Moultrie is not entitled to habeas relief on Ground Nine.

## IV.    Certificate of Appealability is Not Warranted

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides: "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." If a certificate is issued, "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." 28 U.S.C. § 2254 Rule 11(a). A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. *See* 28 U.S.C. § 2254 Rule 11(b).

"[Section] 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'" *Miller-El v. Cockrell*, 537 U.S. at 336 (quoting 28 U.S.C. § 2253(c)). "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" *Buck v. Davis*, 580 U.S. —, 137 S. Ct. 759, 774 (2017) (quoting *Miller-El*, 537 U.S. at 327). "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* that jurists of reason would find it debatable whether the

district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (emphasis added). Here, Petitioner has not made the requisite demonstration. Accordingly, the court should deny a certificate of appealability.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." 28 U.S.C. § 2254 Rule 11(a). If there is an objection to this recommendation by either party, that party may bring such argument to the attention of the district judge in the objections to this report and recommendation.

## V.    Conclusion

For the reasons set forth above, the undersigned respectfully **RECOMMENDS** that:

1.    The petition for writ of habeas corpus (Doc. 1), challenging the judgment of conviction and sentence in *State of Florida v. Tyrone Vincent Moultrie*, Escambia County Circuit Court Case No. 2010-CF-3651, be **DENIED**.

2.    The District Court **DENY** a certificate of appealability.

3.    The clerk of the court be directed to close this case.

At Panama City, Florida, this 5th day of September, 2019.

/s/ *Michael J. Frank*
**Michael J. Frank**
**United States Magistrate Judge**

## **NOTICE TO THE PARTIES**

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of objections shall be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**